## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

REBECCA MASON,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:07-cv-51
(Beckwith, J.; Hogan, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the
final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's
applications for disability insurance benefits (DIB) and Supplemental Security Income (SSI).
This matter is before the Court on plaintiff's Statement of Errors (Doc. 9), the
Commissioner's motion to remand for further administrative proceedings (Doc. 14) and
memorandum in support (Doc. 15), and plaintiff's reply memorandum to the motion to
remand. (Doc. 16).

## PROCEDURAL BACKGROUND

Plaintiff, Rebecca Mason, was born in 1958, and was 48 years old at the time of the
ALJ's decision. Plaintiff has a general education degree and past work experience as a
licensed practical nurse at a nursing home. Plaintiff filed applications for DIB and SSI on
May 9, 2003, alleging disability since April 17, 2003, due to depression, insomnia, anxiety

and panic attacks. Plaintiff's applications were denied initially and upon reconsideration.
Plaintiff requested and was granted a de novo hearing before an ALJ. On February 8, 2006,
plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ
Melvin Padilla.

On May 24, 2006, the ALJ issued a decision denying plaintiff's DIB and SSI
applications. The ALJ determined that plaintiff engaged in substantial gainful activity (SGA)
since her alleged onset date of April 17, 2003 through January, 2004. (Tr. 22)[1]. He
determined that plaintiff's earnings from part-time work at a nursing home were at the
substantial gainful activity level for all but one month in 2003 and in January 2004. *Id.* In the
remainder of 2004 and for 2005 and 2006, her earnings varied month to month, with some at
the SGA level. (Tr. 22).

Next, the ALJ determined that plaintiff suffers from a severe impairment of an
affective disorder with symptoms of depression and anxiety. (Tr. 22). The ALJ found that
plaintiff's personality disorder is not a severe impairment and did not accept the treating
psychiatrist's diagnosis of Bipolar Disorder, Type II. (Tr. 25). The ALJ also found that
plaintiff's severe and nonsevere impairments neither alone, nor in combination, meet or equal
the level of severity described in the Listing of Impairments. (Tr. 25). The ALJ determined
that plaintiff's statements concerning the intensity, duration and limiting effects of her
impairment are not entirely credible. (Tr. 32). According to the ALJ, plaintiff retains the

---

[1]Under the regulations, earnings will ordinarily show substantial gainful activity if they exceed the
formulaic amount described in 20 C.F.R. §404.1574(b)(2)(ii)(B). In 2003, earnings in excess of $800 were
considered substantial gainful activity. In 2004, earnings in excess of $810 were considered substantial gainful
activity. In 2005, earnings in excess of $830 were substantial gainful activity.

residual functional capacity (RFC) to perform work an any defined level of exertion ranging

from sedentary to very heavy, but because of her mental impairment is restricted to performing

"unskilled, simple, repetitive tasks not involving extended periods of concentration and low

stress jobs that are not fast paced or require production quotas and also include the DOT

(Dictionary of Occupational Titles) low stress factors of no inherently stressful or hazardous

activities." (Tr. 25). The ALJ determined that plaintiff is unable to perform her past relevant

work as a licensed practical nurse, but could perform other work that exists in significant

numbers in the national economy including jobs as a laundry laborer and commercial cleaner,

and others. (Tr. 34). Consequently, the ALJ concluded that plaintiff is not disabled under the

Act.

Plaintiff requested review by the Appeals Council. The Appeals Council denied

plaintiff's request for review, making the decision of the ALJ the final administrative decision

of the Commissioner.


## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). The Court's sole function is to determine whether the record as a whole contains

substantial evidence to support the Commissioner's decision. The Commissioner's findings

stand if they are supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a

**4**

finding of nondisability is made and the inquiry ends. Second, if the individual is not

currently engaged in substantial gainful activity, the Commissioner must determine whether

the individual has a severe impairment or combination of impairments; if not, then a finding

of nondisability is made and the inquiry ends. Third, if the individual has a severe

impairment, the Commissioner must compare it to those in the Listing of Impairments, 20

C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the

Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if

the individual's impairments do not meet or equal those in the Listing, the Commissioner

must determine whether the impairments prevent the performance of the individual's regular

previous employment. If the individual is unable to perform the relevant past work, then a

prima facie case of disability is established and the burden of going forward with the evidence

shifts to the Commissioner to show that there is work in the national economy which the

individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v.*

*Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42

U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment

does not establish entitlement to disability benefits. In order for a claimant to recover benefits,

the alleged mental impairment must be established by medical evidence consisting of clinical

signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404,

Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as

physical impairments. Once the Commissioner determines that a mental impairment exists,

5

he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R. § 404.1520a(c)(3). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. 20 C.F.R § 404.1520a(c)(3). *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rating using a five-point scale: None, mild, moderate, marked, and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form.

6

This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

7

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530.

The Social Security regulations recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and

8

extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been

9

resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,*

17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v.*

*Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may

award benefits where the proof of disability is strong and opposing evidence is lacking in

substance, so that remand would merely involve the presentation of cumulative evidence, or

where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v.*

*Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.

1985).

## FACTUAL BACKGROUND

Plaintiff has suffered from depressive symptoms most of her adult life and was

receiving Social Security Disability benefits for over 10 years, from 1990 to 2002 or 2003,

based on her mental impairments. (Tr. 76, 146). In May 2002, plaintiff began working part-

time as an LPN at a nursing home, usually two to five days per month and only when she feels

she can handle it. (Tr. 169, 461, 463).

In April, 2003, plaintiff underwent a total abdominal hysterectomy. (Tr. 180-90). The

record suggested that her depression increased following the hysterectomy. *See, e.g.,* Tr. 241.

Plaintiff began treatment with psychiatrist Peter Ramirez, M.D. on May 22, 2003. At

that time, she indicated that her depression had been returning over the previous four to five

months. She reported she had decreased mood and concentration, was irritable, had anxiety,

and poor sleep. (Tr. 194). Dr. Ramirez diagnosed Major Depression, but recommended ruling

10

out a Bipolar Disorder, Type II. He assigned a global assessment of functioning (GAF)[2] of 48 and adjusted her medications. (Tr. 197).

A State Agency psychologist reviewed the file in September 2003. He noted that plaintiff had a medically determinable impairment of Major Depressive Disorder, Recurrent. (Tr. 216). He opined that this resulted in only a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 223). He thought that she could work at a job that did not require a rapid or consistent pace and that did not require more than superficial interaction with others. (Tr. 228).

Dr. Ramirez saw plaintiff in June 2003 (twice), August 2003 (assessed Bipolar II), December 2003, February 2004, March 2004, April 2004, May 2004, June 2004 (Major Depression vs. Bipolar II), July 2004 (twice), August 2004 (twice), September 2004 (three times), November 2004 (not able to leave the house, feeling more stressed, difficulty comprehending what people are saying, positive for audio/visual hallucinations), and December 2004. (Tr. 321-31). In December 2004, plaintiff was having difficulty thinking clearly and difficulty concentrating. She was having panic attacks and not sleeping well. Her mood was unstable. Dr. Ramirez again thought a Bipolar Disorder, Type II, along with a

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *See* DSM-IV at 32. Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." *Id.*

personality disorder needed to be considered. (Tr. 321). His office notes throughout this time document continued adjustments to plaintiff's medications. (Tr. 321-31). Dr. Ramirez's records also document ongoing problems with insomnia. (Tr. 321, 323, 324, 329, 331). Plaintiff had periodic thoughts of suicide (suicidal ideation or SI). (*See, e.g.*, Tr. 327).

In January 2005, plaintiff was admitted to the hospital for her depression and suicidal thoughts. (Tr. 238-50). She stated her depression had been building since October, as it frequently did after the time change. (Tr. 243). She admitted to thinking strongly of suicide and had a definite plan. She was trying to get her affairs in order. (Tr. 246). She reported using phenobarbital two nights previously (prescribed to her nephew). (Tr. 243). On psychiatric evaluation, her mood was noted as depressed and her thought process appeared to be stream of thought and she showed poor concentration. She was experiencing some auditory, visual and olfactory hallucinations. Her memory was described as impaired, as was her concentration. Her judgment and insight were poor. She was diagnosed with Major Depression with a thought disorder, with a note to rule out borderline personality disorder. She was assigned a GAF of 45. (Tr. 244). After two days in the hospital and medication adjustments, plaintiff was discharged to follow-up with Dr. Ramirez. (Tr. 239).

On January 13, 2005, plaintiff saw Dr. Ramirez for her first post-discharge appointment. (Tr. 320). Plaintiff stated she was not suicidal but her thinking was still cloudy and her thoughts raced throughout the day. Dr. Ramirez adjusted her medications. He stated he would continue to see her at Butler Behavioral Health (Transitional Living) since she no longer had the insurance to cover private appointments. (Tr. 320).

Plaintiff was evaluated at Transitional Living, Inc. on January 20, 2005. (Tr. 274-76).

12

She was evaluated by a psychologist, Dr. Brengle, and reported that her mood is usually sad and she has trouble with concentration and insomnia. "I am an absolute mess. I can't function. There is no purpose for someone like that." (Tr. 270). She reported occasionally hearing voices in another room or strange smells. She was discouraged because counseling had not been effective in the past, but she was willing to try a cognitive behavioral approach. Dr. Brengle diagnosed major depression, recurrent, and a GAF of 39. *Id.* Dr. Brengle noted that further setbacks could precipitate suicidal behavior. (Tr. 274).

Dr. Ramirez evaluated plaintiff on February 4, 2005. (Tr. 260-61). On examination, plaintiff was tearful, with dysphoric mood and blunted range of affect. She was very hopeless and helpless in her presentation. (Tr. 260). She exhibited no psychotic thought content or process. She continued to report impairment with concentration and Dr. Ramirez assessed her judgment and insight to be only fair. (Tr. 261). Dr. Ramirez diagnosed a Bipolar Disorder, Type II, and a Personality Disorder, not otherwise specified (NOS). He assigned a GAF of 40 and adjusted her medications. (Tr. 261). She again saw Dr. Ramirez on February 14 and March 7, 2005. Dr. Ramirez reported that plaintiff continued to experience agoraphobic symptoms and fears of leaving her house and that lack of sleep created the greatest problem with energy, mood, and concentration. Dr. Ramirez again adjusted her medications. (Tr. 257-58).

The following week, plaintiff's depression increased to the point she called the crisis line at Transitional Living and reported feeling very depressed and wanting to kill herself. (Tr. 413). A case manager was sent to her home where she was crying hysterically and was disoriented. She agreed to go to the hospital and the case manager accompanied her. At the

hospital, plaintiff was shaken by the waiting room. She seemed afraid of the people in the waiting room and wanted to leave so the case manager arranged for her to wait in another room. She continued to cry and talk about the several ways she could kill herself. (Tr. 413). Plaintiff was admitted to the hospital and diagnosed with Bipolar Disorder, Type II. (Tr. 332). She felt she was getting worse, she was afraid to go to sleep, she was afraid to go out of her house, and she was unable to work. She thought of killing herself by carbon monoxide. (Tr. 332). Her GAF was assessed at 45. However, plaintiff stated she was no longer feeling like hurting herself and asked to be discharged. (Tr. 337). Plaintiff's case manager took her home from the hospital. Plaintiff admitted she felt trapped in the hospital and was afraid of people. (Tr. 412).

When the case manager followed up with her five days later, she was depressed, tearful, and suicidal. (Tr. 411). She went back to the hospital and was admitted from March 20 to 23, 2005. (Tr. 299). This time she was seen medically by Dr. AlSamkari and an endocrinologist, Dr. Rodney Stone, regarding her menopausal state. (Tr. 299). Dr. Stone thought that plaintiff's problems with sleeping might be related to a postmenopausal syndrome that was not only due to a lack of estrogen, but possibly a lack of testosterone as well. (Tr. 306). Her medications were adjusted and her mood and affect stabilized. She was discharged three days later. (Tr. 299). The testosterone (Estratest) was added to the Premarin in follow-up a month later. (Tr. 415).

Plaintiff continued to be seen at Transitional Living. (Tr. 359-414). She treated with Dr. Ramirez on average of once per month. (Tr. 363-78) (appointments 4/4/05, 5/2/05, 6/13/05, 7/18/05, 8/29/05, 10/10/05). She also saw a therapist, although her attendance at

14

these appointments was spottier. These notes showed variable problems, with good days and bad days. (Tr. 379-98). For example, she cancelled one appointment because she was having a bad day and could not leave her house. (Tr. 382). However, in July, 2005, she noted that she was going to try and work again part-time at her old job because she was behind on "fines" and she did not think that she could "cope with being in jail due to claustrophobia." (Tr. 397). Plaintiff was apparently arrested for reckless operation of a motor vehicle in March 2005, although the date was not clear. She was over-medicated at the time. (Tr. 315). In August 2005, she was apparently incarcerated briefly, resulting in increased panic attacks when she tried to work. (Tr. 391). However, she felt her supervisor understood her mental illness. (Tr. 389). She also reported almost having a panic attack when her usual gas station was closed, but she managed to go to the station across the street once she drove around for a few minutes. She felt nervous and overwhelmed at the idea of reviewing her therapy homework. (Tr. 380).

In August, 2005, plaintiff was evaluated by James J. Rosenthal, Psy.D., at the request of the administrative law judge. (Tr. 314-19). At that time, plaintiff reported being able to handle housekeeping, laundry and cooking duties. However, she noted she only did housework a couple days a week. "Some days she paces and cries for several hours." She noted she had trouble reading because of difficulty concentrating. She lived with her brother and had regular contact with him and a cousin. (Tr. 315). On examination, Dr. Rosenthal noted that plaintiff was restless and fidgety. She asked several times if she could open the door because she felt anxious and apprehensive. He noted her affect was depressed and she was tearful at times. Her speech was slow in pace and her thoughts were expressed in a slow manner. Her concentration was poor and several times during the interview she became

15

confused and answered a prior question. On mental status examination, plaintiff was oriented to person, place, and situation but she did not know what day it was. She had two errors on a Serial 3 test. On a word recall task she could only remember one of three words after five minutes. (Tr. 316).

Dr. Rosenthal concluded that plaintiff suffers from a generalized anxiety disorder along with major depression. He assessed her current GAF at 50. (Tr. 317). He opined that plaintiff's "ability to tolerate the stress of day-to-day employment appears markedly impaired due to her anxiety and depression. She seemed quite anxious and jittery today." (Tr. 317). In a Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Rosenthal indicated that plaintiff had poor or no ability to: maintain attention and concentration for extended periods of time; complete a normal workday or workweek; perform at a consistent pace; make simple work-related decisions; and understand, remember and carry out detailed instructions. He noted only a fair ability in most other areas of occupational adjustment. (Tr. 318-19).

Dr. Ramirez completed a psychiatric review technique form on August 29, 2005. (Tr. 341-348). Dr. Ramirez noted that plaintiff had most of the symptoms of depression and indicated she suffered from a Bipolar Disorder, Type II "with predominantly depressive syndromes (no manic episodes)." (Tr. 344). He also noted signs and symptoms of anxiety and a personality disorder. (Tr. 345, 346). Dr. Ramirez opined that plaintiff was markedly restricted in her activities of daily living. He also noted that she had marked difficulties in maintaining social functioning and marked deficiencies of concentration, persistence or pace. He noted that she had experienced four or more episodes of decompensation. (Tr. 348).

16

In a narrative report dated November, 25, 2005, Dr. Ramirez described plaintiff's treatment history, noting her emotional lability and variable moods "with a strong sense of desperation at times." (Tr. 357-58). He noted that her thought process can be tangential with flight of ideas and she had a short-term memory impairment due to problems with concentration, attention, and distractability. Dr. Ramirez also reported:

> In addition to her mood disorder, she displays evidence of an underlying personality disorder, which I believe has complicated the clinical picture as well as her treatment. She has displayed some pathological dependency in terms of her interpersonal relationships. She has poor adaptability to changes in her life and to stressful events in general that appear to be persistent and are independent of mood symptoms and consistent with personality pathology.

(Tr. 358). Dr. Ramirez continued to diagnose Bipolar Disorder, Type II, and a personality disorder with a GAF of 48. (Tr. 358).

In an accompanying report, Dr. Ramirez indicated that plaintiff would be unable to perform most of the mental demands of work on a regular, sustained basis, in a routine, competitive work placement. (Tr. 351-56). He noted that plaintiff was unable to sustain attention and concentration on her work to meet normal standards of work productivity and work accuracy. "Patient experiences significant emotional lability when stressed, impairing her ability to concentrate and attend to her duties as expected." (Tr. 352). Dr. Ramirez also opined that plaintiff could not behave in an emotional stable manner. "The nature of Bipolar Disorder is emotional/mood instability exacerbated by job stress." (Tr. 353).

Dr. Ramirez noted plaintiff has missed work due to exacerbations of her illness. (Tr. 354). He did not think that she could complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without

17

unreasonable numbers and length of rest periods. "She cannot do this on a consistent basis as normal job stress will eventually result in increase in mood symptoms and therefore, decline in functioning." (Tr. 355). He also noted that "any change in routine would result in increase in stress with increase in symptoms and loss of functioning." (Tr. 355). Dr. Ramirez also noted that plaintiff is easily distracted by others, which in turn negatively affects her ability to maintain focus on job duties. (Tr. 356).

In his last treatment note (Dr. Ramirez was leaving Transitional Living) dated January 9, 2006, plaintiff reported that she felt her "hormones" were finally balanced and her mood was more stable. However, Dr. Ramirez noted that she would continue "to be disabled from performing full-time or even half-time employment at this time." (Tr. 428).

Dyrk VanValkenburg, M.D., has been plaintiff's primary care physician since at least June, 2002. (Tr. 277-89, 349, 416-26). Dr. Van Valkenburg noted that during the course of treatment for other problems, he had also seen plaintiff for depression and anxiety symptoms. (Tr. 277). He was not optimistic about a resolution of her symptoms, "and they have prevented her from engaging in any meaningful work." (Tr. 349). He also felt plaintiff's problems would interfere with her ability to sustain most of the mental demands of work. (Tr. 279-82).

## OPINION

Plaintiff assigns two errors in this case. First, plaintiff contends the ALJ's analysis is factually erroneous in that much of his decision is predicated on the unsupported premise that plaintiff was incarcerated from sometime in March 2005 through July 2005 when there is no record evidence to support this assertion. The ALJ relied on this premise to discount the

opinions of Dr. Ramirez, plaintiff's treating psychiatrist, and Dr. Rosenthal, the consulting

psychologist, who both gave functional assessments consistent with a finding of disability.

(Doc. 9 at 16-17). Plaintiff also contends that the ALJ erroneously determined there were

gaps in plaintiff's treatment with Dr. Ramirez, stating that after plaintiff started treatment at

Transitional Living, Dr. Ramirez "continued to prescribe medications but it s unclear if he saw

her at all and there is no evidence of any evaluations on his part after February 2005." (Tr. 27).

Plaintiff also contends the ALJ exaggerated plaintiff's substance abuse. Plaintiff admits that

she had one episode of using her nephew's Phenobarbital to help her sleep just prior to her

hospitalization for suicidal ideation (Tr. 240-41) and that she on another occasion took all her

remaining Ambien and Klonipin for sleep, at which point Dr. Ramirez discontinued further

refills. (Tr. 324). Plaintiff also states that the ALJ improperly relied on a report of "Dr. Samy"

which is not a part of the instant record (Tr. 26) and made no finding that misuse of any

substances was material to the issue of disability.

Second, plaintiff contends the ALJ's erred when he substituted his own lay opinion for

that of the medical experts and failed to accord proper weight to the opinions of the treating

and examining physicians of record. (Doc. 9 at 18). Instead, the ALJ improperly relied on the

opinion of the non-examining State Agency physician who reviewed the file in September

2003, at a time the ALJ found plaintiff was engaged in substantial gainful activity and prior to

the bulk of the medical evidence in the record. (Doc. 9 at 19).

In response to plaintiff's statement of errors, the Commissioner does not argue that the

ALJ's decision is supported by substantial evidence. Rather, the Commission moves to

remand this matter to the Commissioner for further administrative proceedings pursuant to the

fourth sentence of Section 205 of the Social Security act, 42 U.S.C. § 405(g).[3] (Doc. 14). The Commissioner implicitly concedes that the ALJ's decision must be reversed because the ALJ improperly relied on evidence outside the record to deny benefits with respect to alleged substance abuse and legal problems. The Commissioner asserts that "the record should have been further developed with regard to the evidence of a history of drug problems to which the ALJ referred in his decision" and that plaintiff's "interaction with law enforcement and apparent incarceration, which the ALJ noted several times in his decision, was not adequately developed to permit this Court to perform meaningful review." (Doc. 15 at 4). The Commissioner requests that this Court issue an order instructing the ALJ to follow the law, *i.e.,* do what he should have done in the first place: "base the decision solely on evidence included in the administrative record or adduced at hearing;" "accurately summarize the evidence with appropriate references to the exhibits;" "obtain evidence specifically addressing" the issue of plaintiff's interaction with the criminal justice system if found to be material to the case; and "weigh the medical evidence consistent with the requirements of the Commissioner's regulations, including 20 C.F.R. § 404.1527, and provide an appropriately articulated rationale for the weight assigned to all substantive medical opinions." (Doc. 15 at 6).

After a careful review of the record, this Court is in full agreement with plaintiff that the ALJ's factual and legal conclusions are in error and must be reversed.

The ALJ rejected the opinions of the treating and examining physicians on the

---

[3]Sentence Four of § 405(g) authorizes a court to enter "a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

erroneous assumption that plaintiff was incarcerated for a period of some three months from March to July 2005. This assumption is without substantial support in the record.

Throughout his decision, the ALJ repeatedly referred to the "period from March 2005 through July 2005 (apparent arrest and incarceration related to reckless driving)" and "these months also being the only ones that she had done no nursing work at all" as a time of situational stress and, therefore, not truly indicative of plaintiff's functioning. (Tr. 28, 29, 31, 32). The only evidence of record relating to an arrest is a note from Dr. Rosenthal during his August 2005 evaluation where plaintiff reported to him that "she was arrested for Reckless Operation in March 2005. She explained she was not drinking alcohol at the time but was over-medicated." (Tr. 315). Plaintiff also mentioned her fear of closed in spaces related "to incarceration" to her therapist on July 27 and August 24, 2005. (Tr. 391, 397). From this evidence, the ALJ extrapolates a three month term of incarceration and discounts the treating and examining physicians' assessments in 2005 due to "situational stressors." (Tr. 28). Yet, plaintiff continued to see Dr. Ramirez during the three month period the ALJ says she was incarcerated. (Tr. 257, 371-78) (appointments 3/7/08, 4/4/05, 5/2/05, 6/13/05, 7/18/05). Plaintiff was also hospitalized during this same period, from March 14 to 15, 2005 and March 20 to 23, 2005. (Tr. 299, 332). The ALJ's suggestion that plaintiff was incarcerated for a three month period in mid-2005 is without substantial support in the record.

The ALJ also erred when he stated that Dr. Ramirez "continued to prescribe medications but it is unclear if he saw her at all and *there is no evidence of any evaluations on his part after February 2005*." (Tr. 27, emphasis added). This finding is factually erroneous. The record shows that plaintiff continued to treat with Dr. Ramirez at Transitional Living on a

21

monthly basis until he left that practice in January 2006. (Tr. 363-78, 428-29) (appointments 4/4/05, 5/2/05, 6/13/05, 7/18/05, 8/29/05, 10/10/05, 1/9/06). The ALJ's finding to the contrary is erroneous.

The ALJ also failed to accord proper weight to the opinions of the treating and examining physicians of record in contravention of Social Security regulations and the law of this Circuit. Where a treating physician's opinion on the nature and severity of the plaintiff's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If the ALJ finds that either of these criteria have not been satisfied, he is required to apply the following factors in determining how much weight to give a treating physician's opinion: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir. 2007), citing 20 C.F.R. §404.1527(d)(2).

In this case, plaintiff's treating psychiatrist, Dr. Ramirez, completed a psychiatric review technique form dated August 29, 2005, and made findings consistent with a listing-level impairment. (Tr. 344-48). In a narrative report dated November, 25, 2005, Dr. Ramirez noted plaintiff had "poor adaptability to changes in her life and to stressful events in general that appear to be persistent and are independent of mood symptoms and consistent with personality pathology." (Tr. 358). Dr. Ramirez continued to diagnose Bipolar Disorder, Type II, and a personality disorder and noted a GAF of 48. (Tr. 358). In an accompanying report,

22

Dr. Ramirez indicated that plaintiff would be unable to perform most of the mental demands of work on a regular, sustained basis, in a routine, competitive work placement. (Tr. 351-56). Dr. Ramirez explained, "For at least the past 10 years, the patient has been unable to cope with normal job stress and perform her duties as expected without exacerbations of her illness and loss of function." (Tr. 352). Dr. Ramirez repeatedly linked job stress with a worsening of plaintiff's illness and her unsuccessful attempts to sustain even part-time employment. (Tr. 351, 352, 353, 354, 355). Dr. Ramirez reported that plaintiff "is unable to function at this level [*i.e.*, within a schedule, maintain regular attendance and be punctual] on a consistent basis due to the mood and thought instability caused by her illness" (Tr. 354) and cannot complete a normal work day and work week without interruption from psychologically based symptoms "as normal job stress will eventually result in increase in mood symptoms and therefore, decline in functioning." (Tr. 355).

The ALJ failed to accord any weight to Dr. Ramirez's opinions, and instead substituted his own lay opinion for plaintiff's level of functioning. Most striking in this regard is the ALJ's disregard of Dr. Ramirez's diagnosis of Bipolar Disorder, Type II. The ALJ's decision states, "Dr. Ramirez, a treating psychiatrist, diagnosed bipolar disorder. His records, however, do not indicate any actual manic episodes. Accordingly, it is found that the record does not clearly support that diagnosis." (Tr. 25).

The ALJ is correct that the record reflects no manic episodes, and Dr. Ramirez specifically notes the absence of such episodes. (Tr. 344). What the ALJ fails to appreciate is that the absence of manic episodes is the distinguishing factor between a diagnosis of Bipolar Disorder, Type I, and Bipolar Disorder, Type II. The DSM-IV-TR states, "Bipolar II Disorder

23

is distinguished from Bipolar 1 Disorder by the presence of one or more Manic or Mixed

Episodes in the latter." American Psychiatric Association, Diagnostic and Statistical Manual

of Mental Disorders 396 (4th ed., text rev. 2000). One of the diagnostic criteria for Bipolar ll

Disorder is that "[t]here has never been a Manic Episode or a Mixed Episode." *Id.* at 397. The

ALJ's improper substitution of his own lay opinion for that of the treating psychiatric

specialist is without any support except for his lay understanding of "bipolar" illness. The

ALJ must not substitute his own judgment for a doctor's conclusion without relying on other

medical evidence or authority in the record. *See Hall v. Celebrezze*, 314 F.2d 686, 690 (6th

Cir. 1963); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Ferguson v. Schweiker*, 765

F.2d 31, 37 (3rd Cir. 1985); *Sigler v. Secretary of Health and Human Servs.*, 892 F. Supp.

183, 187-88 (E.D. Mich. 1995). The ALJ's failure to do so in this case constitutes reversible

error. Although the ALJ downplays the importance of the "exact diagnosis" (Tr. 25) in

plaintiff's level of functioning, his substitution of his own lay diagnosis for that of the treating

psychiatrist simply highlights the ALJ's total failure to follow the regulations and law with

respect to treating physician's opinions.

In this regard, the Court notes that Dr. Ramirez is a board-certified specialist in

psychiatry (Tr. 350) who at the time of his mental residual functional capacity assessment had

treated plaintiff for over two years. The Social Security regulations recognize the need for

longitudinal evidence and that a claimant's level of functioning may vary considerably over

time. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2). Since the level of functioning at any specific

time may seem relatively adequate or, conversely, rather poor, proper evaluation of plaintiff's

mental impairments must take into account variations in levels of functioning in determining

24

the severity of her impairments over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2). Dr.

Ramirez, as plaintiff's treating psychiatrist, was in the best position to evaluate plaintiff's

functioning over time. Contrary to the ALJ's intimation that Dr. Ramirez was not even aware

that plaintiff had been working part-time (Tr. 29), Dr. Ramirez's assessment implicitly

recognizes plaintiff's work attempts and the exacerbation of her illness based on work

stresses. For example, Dr. Ramirez specifically noted that plaintiff had been working as an

LPN for "a small amount of hours. It is not clear how long she will be able to keep this up as

she has done this in the past only to decompensate as the stress builds up." (Tr. 367). Dr.

Ramirez's notes also reflect that plaintiff "has been doing some nursing work but limited and

not consistently. She continues to be disabled from performing full-time or evan half-time

employment at this time." (Tr. 428). The fact that plaintiff worked intermittently when her

symptoms permitted reflects the cyclical nature of her illness as set forth in Dr. Ramirez's

assessment.

Moreover, Dr. Ramirez's assessment is fully supported by the record. Dr. Ramirez

noted clinical findings and signs[4] of depressed mood, emotional instability, fatigue, insomnia,

crying spells, impaired concentration and attention, tangential thought process, flight of ideas,

distractability, suicidal ideation, mild paranoid thinking, feeling of worthlessness,

hopelessness, and helplessness, anxiety, interpersonal dependency problems with unstable

---

[4]Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. § 404.1528(b) and (c). *See* 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medieally described and evaluated." 20 C.F.R. § 404.1528(b).

relationships, impaired comprehension, blunted affect, dysphoria, and racing thoughts. (Tr. 342; *see also* Tr. 194, 260, 257-258, 320-331, 371, 374, 377). By failing to consider the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight to be given the opinions of Dr. Ramirez, the ALJ's rejection of the treating physician's assessments of plaintiff's functional capacity is not supported by substantial evidence.

In addition, Dr. Ramirez's assessment is not inconsistent with the other substantial evidence of record. Plaintiff's primary care physician, Dr. Van Valkenburg,[5] saw plaintiff for depression and anxiety symptoms during the course of treating her for other problems and opined that her depression with severe anxiety were the "dominant issue[s]" (Tr. 279) which would interfere with her ability to sustain most of the mental demands of work. (Tr. 279-82). Dr. Van Valkenburg opined that he was "not optimistic about a resolution of her symptoms, and they have prevented her from engaging in any meaningful work." (Tr. 349).

Dr. Ramirez's assessment is further supported by that of Dr. Rosenthal, who evaluated plaintiff at the request of the ALJ. Dr. Rosenthal also found plaintiff to be significantly limited in her ability to perform work-related functions from a mental standpoint. Dr. Rosenthal indicated that plaintiff had poor or no ability to: maintain attention and concentration for extended periods of time; complete a normal workday or workweek; perform at a consistent pace; make simple work-related decisions; and understand, remember and carry out detailed instructions. He noted only a fair ability in most other areas of

---

[5]A treating physician's opinion on the mental state of his patient constitutes competent medical evidence even though the physician is not a certified psychiatrist. *See Kruetzman v. Apfel*, Case No. C-3-98-121 (S.D. Ohio Sept. 13, 1999). *See also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); *Kratochvil v. Barnhart*, 2003 W.L. 22176084 (D. Kan. Sept. 17, 2003). *See also* 20 C.F.R. § 416.927(d)(2).

occupational adjustment. (Tr. 318-19).

In addition, Dr. Ramirez's assessment is supported by hospital records showing exacerbations of plaintiff's illness which resulted in three hospitalizations in 2005 for suicidal ideation. (Tr. 238-50, 299, 332, 337).

The only medical evidence arguably to contrary was opinion of the non-examining State Agency psychologist who opined that plaintiff's mental impairments resulted in only a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 223). The State Agency doctor opined that plaintiff could work at a job that did not require a rapid or consistent pace and that did not require more than superficial interaction with others. (Tr. 228). However, this opinion was given in September 2003, at a time when plaintiff was, according to the ALJ, performing SGA and would not be entitled to benefits in any event. Thus, the State Agency doctor's opinion in September 2003 is not relevant to plaintiff's functioning as of February 2004 and beyond. In any event, the opinion of the State Agency non-examining psychologist is not based on a complete case record, but based solely on pre-September 2003 records. His opinion is not entitled to greater weight than those of the treating and examining physicians and does not provide substantial evidence for rejecting such opinions. *See Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

For these reasons, the Court finds the ALJ's decision is not supported by substantial evidence and should be reversed.

The only remaining issue is whether this matter should be remanded for further proceedings or for an award of benefits. The Court declines the Commissioner's request to

27

remand this matter for further proceedings for further clarification on plaintiff's "interaction with law enforcement" and to further develop the record "with regard to the evidence of history of drug problems to which the ALJ referred in his decision." (Doc. 15 at 4).

As discussed above, the ALJ's suggestion that plaintiff was incarcerated for some three months in mid-2005 is without substantial support in the record. The undersigned fails to see any relevance between a possible short-term incarceration for plaintiff's failure to pay fines and her disability claim for the relevant time period.

On the issue of alleged substance abuse, the Commissioner cites to two incidents which, in the Commissioner's view, suggests plaintiff may have a drug abuse problem. (Doc. 15 at 4). These include an incident in January 2005 in which plaintiff used phenobarbital prescribed to her nephew (Tr. 243) and a March 2005 incident in which plaintiff was arrested for reckless operation of a motor vehicle which she reported to have been the result of over-medication. (Tr. 315). (Doc. 15 at 3-4).

The Social Security Act provides that an individual shall not be considered disabled for Social Security purposes "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The implementing regulations provide: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535. Section 404.1535(b) states that the "key factor" in determining whether drug addiction or alcoholism is a contributing factor material to a determination of disability is whether the claimant would still be found disabled

28

if he or she stopped using drugs or alcohol. *See* 20 C.F.R. § 404.1535(b)(1).

The problem in this case is the ALJ never made a finding that plaintiff had a severe impairment based on any alleged substance abuse problem, or that plaintiff was addicted to or was abusing drugs or alcohol such that any alleged substance abuse was a contributing factor material to a finding of disability. This is not surprising given the dearth of any such evidence. The regulations presuppose "use" on a regular and continuing basis before a determination can be made on the effect of "stopping" such use. In addition, the Court does not believe that out of the two years' worth of records upon which the ALJ based his decision, the two isolated incidents cited by the Commission amount to medical evidence of drug "addiction" as required by § 404.1535.[6] There is absolutely no evidence that Dr. Ramirez believed drug or substance abuse played any factor in his assessment of plaintiff's limitations. Nor has any other medical source in the record limited plaintiff based on any alleged substance abuse. In view of the lack of any evidence suggesting plaintiff would not be disabled in the absence of any alleged substance abuse, the undersigned concludes that a remand of this matter for additional fact-finding on this issue would serve no useful purpose. Therefore, the Commissioner's motion to remand should be denied.

This matter should be remanded for an award of benefits. "[A]ll essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human*

---

[6] The ALJ's citation to "Dr. Samy" in "the prior record" cannot be considered because such evidence is not before the Court in the current record and, in any event, presupposes the ALJ's decision accurately reflects that doctor's report.

*Services*, 820 F.2d 777, 782 (6th Cir. 1987). Each examining and treating physician of record

assessed plaintiff with mental functional limitations that would preclude all work activity on a

full-time basis. The vocation expert testified that a person with the limitations set forth in the

reports of Drs. Ramirez and Rosenthal would be unable to maintain employment. (Tr. 481-

82). The fact that plaintiff has, at times, engaged in part-time employment does not preclude a

finding of disability. Several courts have observed that "the Commissioner takes the position

that at step five of the sequential disability determination, only a claimant's ability to perform

full-time work will permit an ALJ to render a decision of 'not disabled.'" *Barsotti v.*

*Commissioner, Social Sec. Admin.*, 2000 W.L. 328024 (D. Or. March 13, 2000). *See Bladow*

*v. Apfel*, 205 F.3d 356, 359 (8th Cir. 2000); *Kelly v. Apfel*, 185 F.3d 1211, 1214 (11th Cir.

1999); *Sims v. Apfel*, 172 F.3d 879 (10th Cir. 1999)(unpublished), 1999 W.L. 55334, at *3;

*Matz v. Sisters of Providence in Oregon*, No. Civ. 98-1598-JO, 1999 W.L. 1201682 (D. Or.

Dec. 8, 1999). In other words, "[a] claimant is disabled if he cannot perform full-time work.

SSR 96-8p." *Criner v. Barnhart*, 208 F. Supp.2d 937, 956 n.21 (N.D. Ill. 2002); *Gotz v.*

*Barnhart*, 207 F. Supp.2d 886, 897 (E.D. Wis. 2002). "[P]art-time work does not constitute

working on a 'regular and continuing' basis." *Carr v. Apfel*, 1999 W.L. 1489892, *5 (N.D.

Ohio 1999). Thus, the proof of disability is strong and opposing evidence is lacking in

substance. A remand in this matter would merely involve the presentation of cumulative

evidence and would serve no useful purpose. *Faucher*, 17 F.3d at 176. *See also Felisky v.*

*Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir.

1985). Accordingly, this matter should be remanded for an award of benefits commending

February 1, 2004.[7]

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's motion to remand for further administrative proceedings (Doc. 14) be

**DENIED.**

2. This case be **REVERSED** pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with

this opinion and remanded for an award of benefits.

Date: 3/21/08

Timothy S. Hogan
United States Magistrate Judge

---

[7]Plaintiff appears to concede that an amendment of the onset date to February 1, 2004 is appropriate in this case: "The ALJ believed that Ms. Mason engaged in substantial gainful activity through January, 2004. Tr. 22. Assuming there are no impairment related work experiences that would offset her earnings during 2003, the ALJ's finding on this point may be correct and [an] onset date of February 1, 2004, may be more appropriate." (Doc. 9 at 3, n. 3).

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

REBECCA MASON,
    Plaintiff

vs

                                   Case No. 1:07-cv-51
                                   (Beckwith, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FIFTEEN DAYS** after being served with this Report and Recommendation ("R&R"). Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this R&R is being served by mail. That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within TEN DAYS after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).